# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLAYTON SERVICES LLC, | ) | 3:17-CV-00172 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SUN WEST MORTGAGE COMPANY, | ) | |
| INC., | ) | |
| *Defendant*. | ) | June 10, 2021 |

## MEMORANDUM OF DECISION

Kari A. Dooley, United States District Judge

This matter arises out of a contract between the parties, by which the Plaintiff, Clayton Services LLC ("Clayton"), was to perform Post-Close Quality Control ("PCQC") services for the Defendant, Sun West Mortgage Company, Inc. ("Sun West"), a residential and commercial mortgage lender. By Complaint dated February 6, 2017, Clayton asserts that it performed its obligations under the contract but that Sun West refused to make payment as required. In addition to breach of contract claims, Clayton asserts that Sun West violated the covenant of good faith and fair dealing. For its part, Sun West asserts numerous affirmative defenses to the breach of contract claims, to include, that Clayton did not perform its obligations under the contract and that therefore no payment was required. Sun West also denies that it breached the covenant of good faith and fair dealing but asserts that in any event the claim fails as redundant because the conduct allegedly violating the covenant is predicated on express provisions of the underlying contract. The matter was tried to the Court over the course of several diverse days beginning in November 2019 and concluding on January 9, 2020.[1] The Court heard testimony from multiple witnesses and admitted

---

[1] Post-trial briefing concluded on April 10, 2020, by which time the initial surge of the COVID-19 pandemic was at its height in Connecticut and court staff, to include the undersigned, were working remotely in order to give effect to Governor Lamont's stay-at-home orders. The exhibits and voluminous record in this case were not moved off-site when the stay-at-home orders entered in March 2020. The undersigned continued to work remotely until the latter half

many documents as exhibits. Post-trial, the parties submitted simultaneous proposed findings of fact and conclusions of law. Thereafter, they submitted responses to each other's proposed findings of fact and conclusions of law. The Court has considered the testimony and evidence introduced, the arguments set forth in the parties' submissions, the authorities cited therein, and renders this decision based thereupon.

It is for this Court to decide whether and to what extent the parties fulfilled their respective contractual obligations and to assess, at the end of that analysis, the financial responsibility that flows from that determination. For the reasons that follow, with respect to liability, the Court finds for Clayton on Count One, which subsumes Count Two, and for Sun West on Count Three.

**Factual Findings**

In a bench trial, "[a]ssessments of the credibility of the witnesses and the weight to be given to particular pieces of evidence are peculiarly within the province of the [district court] and are entitled to considerable deference." *Cont'l Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 134 F.3d 103, 104 (2d Cir. 1998). "The decisions as to whose testimony to credit and which of permissible inferences to draw are solely within the province of the trier of fact[.]" *Chacko v. DynAir Servs., Inc.*, 272 F. App'x 111, 112 (2d Cir. 2008) (summary order) (internal quotation marks omitted). "[A]s trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) (internal quotation marks and citations omitted). The Court makes the following

---

of June 2020, at which point access to the trial materials (which take up most of the space on my conference table) was restored. Unfortunately, with this passage of time, a complete re-read of the trial transcript and exhibits was required resulting in a lengthy delay in the rendering of this decision.

factual findings by a fair preponderance of the evidence, unless otherwise indicated, based upon the better, more credible evidence presented.[2]

**Jurisdictional Findings**

The parties have stipulated that when the complaint in this matter was filed, Clayton was a Delaware limited liability company whose sole member, Clayton Holdings, LLC, was also a Delaware limited liability company. The sole member of Clayton Holdings, LLC was Clayton Group Holdings, Inc., a corporation organized under the laws of Delaware with a principal place of business in Pennsylvania. The parties have further stipulated that Sun West is a corporation organized under the laws of California with a principal place of business in California. There is, therefore, diversity of citizenship between the parties. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00. This Court has jurisdiction over this matter pursuant to Title 28, United States Code, Section 1332. Sun West does not contest personal jurisdiction. And it has waived any defense as to venue in this district. *See* FED. R. CIV. P. 12(h)(1).

**The Parties**

Clayton is in the business of offering, among other services, residential loan due diligence, including PCQC services, and has been in business for over twenty-five years. Clayton performs PCQC services for a variety of clients in the financial services industry, to include government-sponsored entities such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").

Sun West is a mortgage company for both residential and commercial real estate which offers a variety of mortgage-related products and originates loans. After a loan closing, Sun West

---

[2] The Court does not attempt to include in this decision all of the evidence relied upon in the Court's factual findings. The Court has considered all of the evidence admitted. The reference to any subset of the evidence presented should not be construed as identifying the exclusive basis for the Court's finding, and the Court's failure to identify or mention specific evidence should not give rise to an inference that such evidence has not been considered.

is in the business of selling its loans to, among others, Fannie Mae and Freddie Mac or other federal government agencies.

**PCQC**

Generally, after a residential mortgage loan is closed and the funds are disbursed to the borrower, the lending institution undertakes a review of the process by which the loan was approved, to include such items as the credit underwriting, the accuracy of data collection and recording, compliance with regulatory requirements, property valuation, verification of the borrower's income and the like. This process is known as PCQC. PCQC is similar in many ways to the underwriting process by which the loan is evaluated and approved but is performed after the fact. Lending institutions are required to undertake PCQC reviews for loans backed by or intended to be sold to Fannie Mae/Freddie Mac or other federal agencies which back or purchase mortgage loans. For these lenders and loans, the federal agencies in turn establish minimum protocols ("agency guidelines") for PCQC review and reporting and regularly audit lenders to determine compliance with the agency guidelines.

**The Contract**

In late 2015, Sun West determined to change vendors for the PCQC review of its residential mortgage loans. Previously, Sun West had utilized the services of an affiliated entity, XL Dynamics, and decided in 2015 to utilize the services of a third-party vendor instead. Ultimately, Sun West engaged Clayton to perform these services and the parties proceeded to negotiate and execute a Master Services Agreement ("MSA") on January 14, 2016 and a Statement of Work ("SOW") on January 18, 2016. The SOW was subsequently amended in limited fashion on February 18, 2016. Both parties were represented by counsel in the negotiations and there was a significant back and forth with respect to the terms of the MSA and the initial SOW.

**The MSA**

The MSA derives largely from a template generated in the first instance by Clayton which is used in the industry to establish the relationship between a lender and a vendor providing PCQC services. Among other provisions, the MSA provided the manner and means by which Clayton would invoice Sun West; the manner and means of addressing disputed invoices; the mechanism for terminating the contract for breach or otherwise; and the mechanism for dispute resolution should such disputes arise under the MSA. These and other specific terms of the MSA will be discussed as necessary below.

**The SOW**

The SOW provided the details of the engagement to include the scope of the PCQC services and the extent of Clayton's obligations. The SOW was the result of significant negotiations between the parties. It provides generally that Clayton was engaged to perform a PCQC review on Sun West loan files on a monthly basis. The SOW contemplates that Sun West would upload electronically stored loan files to Clayton's portal. Clayton would perform the required PCQC services and generate monthly reports reflecting the results of the PCQC analysis. As identified in the SOW, Clayton was engaged to perform the following PCQC services:

> _Data Integrity_ – Clayton will gather data from imaged loan files and/or data tapes provided by [Sun West], and will compare agreed-to data in the data file to information in the mortgage loan file to ascertain the accuracy and completeness of the subject database. Any discrepancies will be reported. …
>
> _Validity of Credit Underwriting_ – Clayton will review each loan using credit guidelines provided by [Sun West]. The result of this review will be to ascertain conformance with the guidelines and to assign a credit event grade to each loan as follows:[3] …
>
> _Regulatory Compliance_ – Clayton will input the appropriate data points into its Clayton Loan Analysis System, (eCLAS), to determine the compliance of each loan

---

[3] The grading system is not germane to the parties' dispute.

to Federal, state and local anti-predatory lending laws using the parameters agreed to by Clayton and [Sun West].

The purpose of this review will be to assign a compliance event grade to each Loan reviewed.[4] …

*Valuation Review* – Clayton will review the origination appraisal to determine that the original appraisal was complete, thorough and that the appraised value appeared to be supported by appraisal information and any other documents in the file pertaining to property value[.] If requested by [Sun West], Clayton will also order valuation products from either a Clayton Affiliate, or a third party vendor. The cost of all third-party valuation products ordered by Clayton will be billed as passed through costs to [Sun West]. …

Tr. Ex. 2 at 1–2. With the exception of possible third-party vendor participation in the Valuation Review, each of these services involved only a review and analysis of the Sun West files uploaded to Clayton's portal. In other words, the outcome derived entirely from information provided by Sun West and analyzed by Clayton personnel with the results being generated in a monthly report sent to Sun West. The Court refers to these PCQC services as the File Review Services. The File Review Services made up the majority of the work required by Clayton under the terms of the MSA and SOW.

In addition, the SOW contemplated that Clayton would provide access to third-party products or would arrange for work to be performed by third-party vendors as follows:

*Third Party Review Offerings*
If requested by [Sun West], Clayton will order and review the following valuation and re-verification products from a Clayton Affiliate or third party vendor. Any products ordered from a third-party will be billed as pass-through costs in accordance with this Schedule[.]

*Id*. at 2. The SOW identifies four areas for which third-party vendors or products could be requested by Sun West. As pertinent here, the SOW contemplates the use of third-party vendors for "Re-Verifications" of, among other things, the employment and income of the borrowers.

---

[4] The SOW detailed the scope of the compliance review, which scope shall be discussed herein as necessary.

Specifically, the SOW indicates that "Clayton will order a third-party report that contains employment and income information for borrower(s) to validate reasonableness of income and verify employment[.]" *Id*. at 3.

Finally, the SOW included a schedule of costs or the charges for Clayton's services.

The SOW was amended on February 18, 2016 to expand the scope of reverification services and to establish costs for those services. Tr. Ex. 3. Specifically, the SOW was amended to reflect that Clayton would conduct reverification of the borrower's deposit as well as employment if online products or services were unsuccessful in this regard.

Although Sun West did not initially request any third-party products or services, on February 25, 2016, Sun West sought the reverification services identified in the SOW, as amended. Tr. Ex. 16.

**Performance under the Contract**

The following facts are, for the most part,[5] uncontroverted:

The January [2016] batch of loans selected by [Sun West] for review contained 265 loans.

In March 2016, [Clayton] issued findings to [Sun West] on the January 2016 batch of loans that it reviewed.

The February [2016] batch contained 278 loans for review.

In April and May 2016, [Clayton] issued findings to [Sun West] on the February 2016 batch of loans that it reviewed.

The March [2016] batch contained 449 loans for review.

---

[5] In its Proposed Findings of Fact and Conclusions of Law, Sun West lists these as stipulated facts. (ECF No. 163 at 1–4). However, they appear to be a mix of facts taken, in large part, from "Plaintiff's Proposed Findings of Fact" (ECF No. 64 at 21–30) and the "Stipulation of Uncontroverted Facts" (ECF No. 64 at 14–16) sections in the parties' Joint Trial Memorandum. Notably, in its post-trial Proposed Findings of Fact and Conclusions of Law, Clayton states that the amount of loans it reviewed each month were as follows: 268 loans in January; 311 loans in February; 449 loans in March; 403 loans in April; and 405 loans in May. (ECF No. 162 at 11). The precise number of loan files does not impact the outcome of the trial.

In May [and June] 2016, [Clayton] issued findings to [Sun West] on the March 2016 batch of loans that it reviewed.

The April [2016] batch contained 403 loans for review.

In June 2016, [Clayton] issued findings to [Sun West] on the April 2016 batch of loans that it reviewed.

The May [2016] batch contained 403 loans for review.

In July 2016, [Clayton] issued findings to [Sun West] on the May 2016 batch of loans that it reviewed.

[Clayton] submitted the following invoices to [Sun West]:

> a. Invoice No. 0016620R, dated May 4, 2016 for $90,575.50;
> b. Invoice No. 0017301, dated August 3, 2016 for $143,309.40;
> c. Invoice No. 0017310, dated August 3, 2016 for $213,662.65;
> d. Invoice No. 0017311, dated August 3, 2016 for $195,008.80; and
> e. Invoice No. 0017325, dated August 3, 2016 for $175,923.70.

[Sun West] has made no payment on any of the invoices submitted by [Clayton].

[Sun West] sent [Clayton] a letter dated July 6, 2016 (the "Termination Letter") stating that it was terminating the SOW pursuant to Section 2(c) of the MSA, which is titled "Termination for Breach," and Section 7 of the SOW, and stating that Clayton had failed to provide the services as contemplated by Section 2 of the SOW and Sun West's standards and expectation.

By letter dated September 15, 2016, [Clayton] requested [Sun West] to propose mediators to conduct a mediation prior to the initiation of any litigation over the payment of [Clayton's] invoices, as required by Section 17(d)(i) of the MSA.

[Clayton] formally initiated mediation with the American Arbitration Association as required by paragraph 17(d) of the MSA on September 28, 2016.

Mediation occurred on December 22, 2016.

The mediation was unsuccessful.

(ECF No. 163 ¶¶ 10–26 (internal citations omitted)). Additional findings of fact shall be set forth

as necessary.

**Discussion**

Because this is a diversity case, the Court applies Connecticut substantive law. *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005) (federal courts sitting in diversity apply the substantive law of the forum state). In Connecticut, "parties to a contract generally are allowed to select the law that will govern their contract[.]" *Elgar v. Elgar*, 238 Conn. 839, 850 (1996). Here, the MSA contains a choice-of-law provision stating that the agreement "shall be governed by and interpreted in accordance with the laws of the State of New York for contracts to be wholly performed in such state and without giving effect to the principles thereof regarding the conflict of laws." Tr. Ex. 1 at 14. Further, the parties do not dispute that New York law applies. Accordingly, the Court applies New York law in evaluating Clayton's contract-based claims.

**Breach of Contract – Counts One and Two[6]**

Under New York law, to establish a claim for breach of contract, Clayton must demonstrate the (1) existence of a contract; (2) plaintiff's performance pursuant to the contract; (3) defendant's breach of its obligations; and (4) damages resulting from the breach. *All Seasons Fuels, Inc. v. Morgan Fuel & Heating Co.*, 66 N.Y.S.3d 512, 515 (2d Dep't 2017).

The parties do not dispute the validity of the MSA or the SOW, collectively "the contract." And Sun West does not dispute that it did not make any payment to Clayton under the contract. The factual and legal dispute between the parties largely centers on whether Clayton performed its obligations under the contract such that Sun West's termination of the contract and failure to pay Clayton's invoices was a breach of the contract. Clayton asserts, and Sun West disputes, that it

---

[6] Count One alleges that Sun West breached the contract by failing to pay the full amount of the invoices. Count Two alleges that Sun West breached the contract by failing to pay the **undisputed portions** of the invoices, a lesser sum. Because the Court has resolved all contract disputes related to liability in favor of Clayton, and because the damages alleged in Count Two are subsumed in the damages sought in Count One, the Court does not further address Count Two.

performed all of the PCQC services required under the contract. First, Clayton asserts that the evidence establishes that the File Review Services and the monthly reports generated in connection with these services satisfied the vast majority of Clayton's obligations under the contract and that Sun West has put forth no evidence to the contrary. Clayton next asserts that, to the extent it had obligations with respect to the reverification process, it fulfilled those obligations as well.

In response, and by way of affirmative defense,[7] Sun West asserts that the File Review Services and the monthly reports generated were inadequate for its purposes. Sun West further avers that the employment and income reverification process contemplated under the contract was required to be performed pursuant to agency guidelines and that Clayton's failure to conduct reverifications in accordance with such guidelines rendered all of Clayton's work valueless to Sun West, thereby justifying both the termination of the contract and the withholding of payment.

In response, Clayton asserts that the SOW as amended is unambiguous and contains no obligation to conduct reverifications according to agency guidelines. Clayton further relies upon a merger clause as precluding consideration of outside evidence on this issue.

Although both Clayton and Sun West assert that the unambiguous terms of the SOW as amended support their respective positions, Sun West also asserts in the alternative that the SOW as amended may be ambiguous and argues therefore that the Court should consider evidence as to the parties' intent, including the nature and content of the contract negotiations as principally testified to by Sydney Fernandez, a systems analyst for Sun West.

### File Review Services

It became evident during the trial that the crux of the dispute between the parties centers on the extent to which Clayton met its obligations with respect to the reverification process. Indeed,

---

[7] Sun West raises a number of affirmative defenses which will be discussed in turn.

the vast majority of the parties' post-trial briefing is dedicated to this issue. Accordingly, before turning to the question of what those obligations were under the contract or resolving the conflicting evidence as to whether Clayton met those obligations, the Court addresses Clayton's contractual performance as to the File Review Services. The weightier, more credible evidence is that Clayton substantially met all of its contractual obligations in this regard. Although there were some delays in the process, some on Sun West's end and others on Clayton's end, the File Review Services went forward largely as contemplated. Sun West uploaded large batches of electronic loan files to Clayton's portal on a monthly basis for the months of January through May 2016. Clayton personnel then performed the File Review Services required under the SOW and generated reports which flagged potential regulatory problems and/or other issues with respect to individual loans. Once the reports were sent to Sun West, flagged loan files were either verified as true errors or identified as "false positives" in the report. Additional back and forth discussions were held as necessary to finalize any questions regarding the report or individual loan files. The process by which a lender and a PCQC vendor would undertake this back and forth is standard in the industry and does not bespeak any shortcomings on the part of the PCQC vendor. Clearly, if the monthly reports were riddled with errors and incorrect identifications of problematic loans, the outcome might be different. But that is not the evidence here.

Although Sun West puts forth the number of "defects" it identified in the monthly reports, it offered only conclusory opinion testimony or summary spreadsheets as to these purported defects. Sun West did not introduce any actual loan files through which a defect or defects in a monthly report might be demonstrated. Moreover, the number of alleged defects is *de minimis* when viewed against the enormous number of data points being analyzed in each batch of loans. The parties agree that Clayton received and reviewed approximately 1,800 loan files from Sun

West. Daniel Pinero, Clayton's then-Director of Operations for securitization reviews, testified, credibly, that Clayton reviewed anywhere from 1,000 to 1,500 data points per loan when performing the PCQC under the contract.[8]

Finally, although Sydney Fernandez testified that Sun West expressed its concerns regarding the quality of the File Review Services at the time of the engagement, his testimony was not credible nor substantially corroborated. Aside from the rebuttal process described above, where a "false positive" might be identified and corrected in the back and forth between Clayton and Sun West, Sun West offers no contemporaneous communications which evince significant concerns or complaints regarding the quality of the monthly reports or the File Review Services. For example, Sun West asserts that it raised File Review Services issues with Clayton regarding the identification of invalid TRID/TILA (i.e., TILA-RESPA Integrated Disclosures and Truth in Lending Act) issues in multiple cycles during the engagement. However, it appears from the evidence that Clayton cured these issues in a timely fashion when raised by Sun West. Further, it appears that the purported dissatisfaction with the File Review Services was not purposefully "documented" by Sun West until well after the parties' relationship had soured and Sun West had made the decision to terminate the contract and withhold payment on each of Clayton's invoices.[9]

Further, the MSA spelled out the process by which Sun West could challenge Clayton's invoices. Specifically, the MSA provides:

> <u>Invoicing and Payment</u>. Unless otherwise specified in a Statement of Work, Supplier(s) [i.e., Clayton] shall invoice the Company [i.e., Sun West] no later than thirty (30) days after Services have been completed under the applicable Statement of Work. Each invoice submitted by a Supplier shall be accompanied by reasonable

---

[8] Although this number may include the additional reverification services, the evidence was clear that the vast majority of the PCQC services involved the File Review Services.

[9] Sun West offered a series of spreadsheets as "business records," (Tr. Exs. 520, 537, 549, 555, 565), which the Court admitted into evidence over Clayton's objection that the documents were hearsay (not business records) and were created in preparation for litigation. Subsequently, the genesis of these exhibits and the testimony upon which they were admitted were called into question. Accordingly, the Court gives little weight to these spreadsheets.

supporting documentation, if applicable. Each invoice shall separately identify credits for amounts previously paid by Company and the amount of taxes a Supplier is proposing to collect, if any. The Supplier shall include with the invoice the calculations utilized to establish the amounts charged in sufficient detail to enable the Company to confirm the accuracy thereof. The Company agrees to pay all undisputed invoices, or the undisputed portions thereof, within thirty (30) days of receipt. Except in the case of disputed invoices, if payments are not received within sixty (60) days after the Company's receipt of such invoice, each Supplier reserves the right to impose, and the Company agrees to pay, interest on overdue balances for each day of the period starting with the forty-sixth (46th) day following receipt of the invoice and ending on the day payment is received by the Supplier, provided that the Supplier has provided the Company with notice that the relevant invoice is overdue. Interest will be computed on a rate of twelve percent (12%) per annum, compounded daily, not to exceed 18% per year.

. . .

Disputed Invoices. If the Company, in good faith, disputes any invoice (or a portion thereof), it may withhold payment of any disputed amounts but agrees to pay any non-disputed portions in accordance with Section 3(a) *[sic]*. Prior to the initiation of any dispute resolution as provided in this Agreement, Company and the Supplier agree to work together in good faith to resolve any disputes concerning any invoice.

Tr. Ex. 1 at 2.

Accordingly, the MSA required both interaction regarding any disputes and timely payment for those portions of the invoices which were not at issue. However, following the issuance of the invoices for February through May on August 3, 2016, Sun West made no effort to avail itself of this process, which further undermines any testimony that it was dissatisfied with the File Review Services. Notably, the File Review Services account for the vast majority of the invoiced services rendering non-payment of at least the portions of the invoices related to these services an unjustified breach of the contract.

The Court therefore concludes that Sun West breached the contract when it failed to pay Clayton for these services, irrespective of the dispute regarding Clayton's performance of the reverification obligations of the contract. Indeed, the decision to withhold all payment even though the reverification services represented but a small part of the work under the contract is without

13

reasonable explanation. Sun West's argument that the reverification issues rendered all of Clayton's work useless is inconsistent with the weightier and more credible evidence of record.

### Reverification

The first question for the Court is whether the contract is ambiguous, rendering consideration of parol, or other extrinsic, evidence appropriate to ascertain the intent of the parties. As discussed above, both parties assert that the contract language is unambiguous and that it supports each of their respective positions. Clayton further relies upon the so-called integration clause of the MSA which provides:

> Entire Agreement. This Agreement and the attached Exhibits supersede all prior agreements and understandings between the Parties with respect to the subject matter of this Agreement and the applicable Statements of Work and constitutes the complete agreement and understanding between the Parties unless modified in a writing signed by Clayton and the Company.

Tr. Ex. 1 at 13.

"[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms[.]" *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide[.]" *Id.* "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations[.]" *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014) (internal quotation marks and citations omitted). "A contract is unambiguous if the language it uses has a definite and precise meaning, … and concerning which there is no reasonable basis for a difference of opinion[.]" *Greenfield*, 98 N.Y.2d at 569 (internal brackets and quotation marks omitted). "[I]f the agreement on its face is reasonably

susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity[.]" *Id*. at 569–70.

"Ambiguity is determined by looking within the four corners of the document, not to outside sources[.]" *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (internal quotation marks and citation omitted). "The entire contract must be reviewed and particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Id*. (internal quotation marks and brackets omitted). "Form should not prevail over substance and a sensible meaning of words should be sought[.]" *Id*. (internal quotation marks omitted).

"[T]he parol evidence rule operates to preclude evidence of a prior or contemporaneous communication during negotiations of the agreement that contradicts, varies, or explains a written agreement which is clear and unambiguous in its terms and expresses the parties' entire agreement and intentions[.]" *Vivir of L I, Inc. v. Ehrenkranz*, 7 N.Y.S.3d 411, 413 (2d Dep't 2015). "Parol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013). Parol evidence "is inadmissible to alter or add a provision to a written agreement." *Id*. "[A] merger clause . . . establish[es] the parties' intent that the [a]greement is to be considered a completely integrated writing[.]" *Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 599–600 (1997). "A completely integrated contract precludes extrinsic proof to add to or vary its terms[.]" *Id*. at 600. Therefore, "where a contract contains a merger clause, a court is obliged to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing[.]" *Schron*, 20 N.Y.3d at 436 (internal quotation marks omitted).

As a preliminary matter, the Court rejects Sun West's claim that the contract unambiguously requires Clayton to perform reverifications in accordance with agency guidelines. Such a requirement simply appears nowhere in the contract. Nonetheless, Sun West relies, in part, on the following language in the SOW: "*Validity of Credit Underwriting* – Clayton will review each loan using credit guidelines provided by the Company." Tr. Ex. 2 at 1. Sun West asserts that it directed reverification services to be done in accordance with the agency guidelines pursuant to this contract provision, among others. The Court is not persuaded. This provision of the SOW is wholly separate and distinct from the reverification services contemplated under the SOW. As discussed above, credit underwriting was part of the File Review Services and any effort to graft this provision onto the reverification provisions of the SOW accordingly fails.

Turning to the language at issue, in pertinent part, the SOW provides:

*Third Party Review Offerings*
If requested by the Company, Clayton will order and review the following valuation and re-verification products from a Clayton Affiliate or third party vendor. Any products ordered from a third-party will be billed as pass-through costs in accordance with this Schedule, and no products will be ordered without Company's prior authorization. The Company represents that it has the full legal authority, including but not limited to "permissible purpose" under the Fair Credit Reporting Act, as applicable, to cause Clayton to order any third-party re-verification product described herein, and hereby authorizes Clayton to provide necessary loan information to Clayton's third party providers in order to obtain such information. In the event Company requests that Clayton work with certain information providers with whom Clayton does not have a products or services agreement in place, the Company agrees to facilitate coordination between such provider and Clayton, and acknowledges that different providers may need to be used while Clayton and such provider mutually negotiate and accept an agreement.

. . .

      *Re-Verifications*
      •   DataVerify - Clayton will order a DataVerify Report for each loan to analyze for potential Fraud, Occupancy misrepresentation, and SSN verifications

- <u>Employment/Income Verification</u> - Clayton will order a third-party report that contains employment and income information for borrower(s) to validate reasonableness of income and verify employment; Company may be required to establish an account with the third-party vendor to obtain reports

Tr. Ex. 2 at 2–3. The fees associated with the Third Party Review Offerings appear at Section 5, which contains two tables—Table "a" for Service Fees and Table "b" for Pass-Through Costs:

a.    <u>Service Fees</u>. As compensation for the Services rendered pursuant to this SOW, Clayton shall be paid in accordance with the following (the "Service Fees"):

| Description of Service | Price |
|---|---|
| Post-Close QC Services – Conventional | $185.00 per loan file |
| Post-Close QC Services – FHA / VA | $215.00 per loan file |
| Post-Close QC Services – Jumbo | $235.00 per loan file |
| Self-Employed Borrower | $40.00, plus initial per file pricing |
| QM/ATR Review, as applicable | $30.00 per loan file |
| Loan File Indexing | $22.00 per loan file |
| TRID Review, as applicable | TBD* |
| Desk Review (affiliate) | $75.00 per loan file |
| Field Review (affiliate) | $270.00 (+) per loan file |
| BPO (affiliate) | $95.00 per loan file |
| AVM (affiliate) | $5.00 - $12.00 per loan file |
| Review & Administration of 3rd party products | $25.00 per loan file |
| Transaction Management Support, and Condition Clearing after initial review | $75.00 per hour |

*TRID review pricing will be determined after at least 50 applicable loans have been reviewed per this SOW, and will be agreed upon in a written amendment to this SOW.

b.    <u>Pass-Through Costs</u>. For any third-party products ordered by Clayton as described in Section 2 of this SOW, Clayton will pass through all such costs to the Company in accordance with the following estimates:

| Third Party Product | Price Each (estimated, actual costs will be passed through)* |
|---|---|
| Data Verify (Occupancy, Verification, SSN Verification, Fraud Report) | $11.50 |
| Work Number – Verification of Employment with or without Income (wage earner) | $29.00 (per employer, per borrower) |
| Standard Desk Review | $65.00 - $75.00 |
| Field Review | $400.00 (+) |

| | |
|---|---|
| BPO | $93.00 - $145.00 |
| AVM | $9.00 - $12.00 |
| CDA / ARR | $145.00 - $155.00 |

\*The Company acknowledges and agrees that pass-through costs vary by product, turn time, and provider. For valuation products, cost is dependent on location, appraiser, comps, and provider.

*Id.* at 4. When the SOW was amended on February 18, 2016, the tables for Service Fees and Pass-

Through Costs were amended as follows:

2.      The tables for Service Fees and Pass-Through Costs set forth in Section 5 of the SOW are deleted in their entirety and replaced with the following tables, commencing as of the Amendment Effective Date:

| Description of Service | Price |
|---|---|
| Data Integrity | Included |
| Post-Close QC Services – Conventional | $185.00 per loan |
| Post-Close QC Services – FHA/VA | $215.00 per loan |
| Post-Close QC Services – Jumbo | $235.00 per loan |
| Self-Employed Borrower | $40.00, plus initial per file pricing |
| QM/ATR Review, as applicable | $30.00 per loan |
| TRID Review, as applicable | $185.00 – any combination of LEs and CDs totaling 4<br>Discount of $60 on Credit/Compliance/Valuation pricing when TRID review applies\* |
| Additional LE and/or CD review (as applicable, based on reviews of LE's or CE's in excess of the standard TRID review) | $15.00 each, LE or CD \* |
| Desk Review (affiliate) | $75.00 per loan |
| Field Review (affiliate) | $270.00 (+) per loan |
| BPO (affiliate) | $95.00 per loan |
| AVM (affiliate) | $5.00 - $12.00 per loan file |
| Review & Administration of 3rd party products | $25.00 per loan |
| Verification of Deposit (If on line is unsuccessful) | $25.00 per institution (+) pass though *[sic]* |
| Verification of Employment (If on line is unsuccessful) | $22.00 per borrower (+) pass through |
| Condition Clearing beyond 2 weeks non TRID | $75.00 per hour |
| Condition Clearing TRID | $75.00 per hour \* |

\*TRID Review fee is not applicable for January 2016 loan population

| Third Party Product | Price Each (estimated, actual costs will be passed through)* |
|---|---|
| Data Verify (Occupancy Verification, SSN Verification, Fraud Report) | $11.50 |
| Written Verification of Employment with or without Income (wage earner) | $29.00 (per employer, per borrower) |
| VOE (Employer fees) | $2.50 - $40.00 if applicable |
| VOD (Bank Fees) | $2.50 - $40.00 if applicable |
| Standard Desk Review | $65.00 - $75.00 |
| Field Review | $400.00 (+) |
| BPO | $93.00 - $145.00 |
| AVM | $9.00 - $12.00 |
| CDA/ARR | $145.00 - $155.00 |

*The Company acknowledges and agrees that pass-through costs vary by product, turn time and provider. For valuation products, cost is dependent on location, appraiser, comps and provider.

Tr. Ex. 3 at 1–2.

Clayton maintains that the SOW as amended unambiguously required reverification of employment and deposit through the use of third-party vendors which provide online products and services. And that only when such products failed to verify either employment or deposit, would additional work by Clayton personnel be required. Further, Clayton asserts that where Clayton was required to perform reverifications, it was not required to do so per agency guidelines. Finally, Clayton relies upon the merger clause and the integrated nature of the contract as precluding consideration of any parol, or extrinsic, evidence on this latter issue.

Sun West asserts in the alternative that the SOW as amended is ambiguous on the issue of whether agency guidelines were required to be followed in the reverification process, and that the parol, and other extrinsic, evidence offered established that it was the intent of the parties that the reverification services be done in accordance with agency guidelines.[10]

---

[10] On this issue, Sydney Fernandez testified that this requirement is implicit in the contract and that specifying the precise guidelines was unnecessary because it was understood that the work would be done to agency guidelines. He relies principally on the discussions held prior to the execution of the contract. This was a commercial contract between

The Court agrees with Clayton. The contract is a fully integrated agreement that, as noted above, contains no requirement that the agency guidelines will govern the PCQC generally, or more specifically, the reverification obligations. While much of what was required under the SOW is also required under the agency guidelines, i.e., valuation review and regulatory compliance, this does not, as testified to by Mr. Fernandez, demonstrate that the PCQC was to be performed to agency guidelines in all respects.[11] Indeed, with respect to the reverification process, not only does the plain and unambiguous language of the SOW not require reverification pursuant to agency guidelines, the language actually suggests that no such requirement was contemplated.

The parties agree that the agency guidelines for PCQC employment reverification require that the reverification be obtained from the original source, i.e., the same source that provided the employment verification in the first instance. This source might have been the borrower's employer and reverification in accordance with agency guidelines would therefore have required that Clayton contact the employer directly rather than "order a third-party report that contains employment . . . information . . . [to] verify employment[,]" as required by the SOW. Tr. Ex. 2 at 3. Indeed, it was Clayton's alleged failure to perform reverification by returning to the original source on which Sun West relies, in large measure, to justify non-payment of Clayton's invoices. However, this "original source" requirement could never have been fulfilled through the use or purchase of online services and products for those loans for which the original source was the

sophisticated entities, which were both represented by counsel. Mr. Fernandez's opinion regarding implied contract terms is rejected as both self-serving and inconsistent with the unambiguous language of the contract.

[11] Jennifer Vallinayagam, Sun West's Chief Operating Officer, also testified that the PCQC was to be performed to agency guidelines in all respects. This may well have been her plan. This had been her directive to Mr. Fernandez when tasking him with locating the PCQC vendor and Mr. Fernandez had confirmed for her that he had followed this directive. Her testimony therefore derives from what she told Mr. Fernandez and what Mr. Fernandez told her. And although she testified that she reviewed the contract before signing it, there is no question that the SOW does not contain this requirement with respect to reverifications. Her testimony therefore sheds no light on the contract provisions, but it does demonstrate Mr. Fernandez's interest in the outcome of this litigation and therefore provides further reason to question the reliability of his testimony.

borrower's employer. Neither would it have been fulfilled if the borrower's employment was verified by anything other than an online service or product.[12] And the SOW amendment is clear that Clayton personnel will provide reverification services ONLY in those circumstances where the reverification process through the use of such online services and products is unsuccessful. Tr. Ex. 3 at 1. It would make little sense for the SOW to contemplate reverification by a means that would not comply with the agency guidelines for that subset of loans for which the original source was the borrower's employer, if in fact, such guidelines compliance was required under the SOW. Indeed, the SOW was the subject of significant negotiations with both parties being represented by counsel. If Sun West wanted the agency guidelines to govern the scope and nature of Clayton's reverification obligations, as a sophisticated party to the contract, it could have, and presumably would have, included such a requirement.

The Court observes that after Sun West began raising concerns regarding the reverification services, the relationship between the parties and the nature of the engagement morphed into something quite different than what was contemplated in the SOW. Sun West made a series of requests or demands with respect to the reporting process; the reverification process; documentation of Clayton's work and the like. The issues were escalated to upper management at both Clayton and Sun West. Clayton, viewing Sun West as a valuable customer, tried to address Sun West's concerns; acquiesced in many of their requests and notably did not challenge whether Sun West's demands were consistent with the contract. But to the extent Sun West relies upon these events and the corresponding contemporaneous communications between the parties as evidence of the parties' intent or as evidence of the actual terms of the contract, as discussed above, consideration of the evidence for this purpose is prohibited. *See R/S Assocs. v. New York Job Dev.*

---

[12] In fact, under the contract, the "original source" requirement would only have been fulfilled if the original underwriter and Clayton both used the same online service or product.

*Auth.*, 98 N.Y.2d 29, 33 (2002) ("[W]hen interpreting an unambiguous contract term evidence outside the four corners of the document is generally inadmissible to add to or vary the writing[.] Extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face[.]" (internal quotation marks, citations and alterations omitted)).

Accordingly, Clayton has met its burden that it performed its obligations with respect to the reverifications, such that Sun West's failure to pay Clayton's invoices for these services was also a breach of the contract.[13]

### Breach of the Covenant of Good Faith and Fair Dealing

"Within every contract is an implied covenant of good faith and fair dealing[.]" *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 697 N.Y.S.2d 128, 130 (2d Dep't 1999). "This covenant is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement[.]" *Id.* Put another way, the implied covenant includes a "pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]" *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (internal quotation marks and citation omitted). The party asserting lack of good faith has the burden of proving the breach. *See Good Hill Master Fund L.P. v. Deutsche Bank AG*, 46 N.Y.S.3d 33, 38 (1st Dep't 2017); *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007).

---

[13] Clayton surmises that, at some point, Sydney Fernandez realized that he had negotiated a contract with Clayton that did not address the concerns raised by FNMA in February 2016 (after the engagement was underway) regarding Sun West's failure to reverify employment from the original source, and rather than take ownership of this failure, determined to lay the blame on Clayton. While this theory provides an explanation for the events that unfolded and derives from reasonable inferences from the body of evidence, such inferences are not required and the Court need not, and so does not, draw such inferences.

Clayton alleges that Sun West breached the implied covenant of good faith and fair dealing by (1) purporting to terminate the contract without abiding by the terms of the termination clause of the MSA and SOW; (2) withholding payment on all invoices while only disputing a small portion of the invoices; and (3) refusing to communicate with Clayton regarding the nonpayment of invoices. (ECF No. 162 at 21).

As to this claim, Sun West argues, principally, that Clayton's breach of the implied covenant claim is duplicative of its contract claim because it is predicated on express provisions of the contract, specifically, the "Termination for Breach," "Invoicing and Payment" and "Disputed Invoices" provisions of the MSA. Clayton responds that the breach of the implied covenant claim is not duplicative of its contract claim because the implied covenant claim is based on conduct distinct from that supporting its contract claim. Specifically, Clayton argues that its contract claim is based on Sun West's failure to the pay the invoices while its implied covenant claim is based on Sun West's conduct in purportedly terminating the contract, refusing to pay invoices, and thereafter refusing to communicate with Clayton concerning the unpaid invoices.

"To avoid redundancy, '[c]laims of breach of the implied covenant . . . must be premised on a different set of facts from those underlying a claim for breach of contract.'" *Rozenzweig v. ClaimFox, Inc.*, 251 F. Supp. 3d 449, 460 (E.D.N.Y. 2017) (quoting *Deutsche Bank Secs., Inc. v. Rhodes*, 578 F.Supp.2d 652, 664 (S.D.N.Y. 2008)). "Accordingly, '[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of … an express provision of the underlying contract.'" *Rozenzweig*, 251 F. Supp. 3d at 460 (quoting *ICD Holdings S.A. v. Frankel*, 976 F.Supp. 234, 243–44 (S.D.N.Y. 1997)).

Similarly, "'[a] cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is "intrinsically tied to the damages allegedly resulting from a breach of the contract."'" *Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc.*, 333 F. Supp. 3d 307, 315 (S.D.N.Y. 2018) (quoting *Deer Park Enters., LLC v. Ail Sys., Inc.*, 870 N.Y.S.2d 89, 90 (2d Dep't 2008)). As such, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained if the damages sought by plaintiff are duplicative "of the damages asserted in connection with [plaintiff's] breach of contract claim[.]" *Able Energy, Inc. v. Marcum & Kliegman LLP*, 893 N.Y.S.2d 36, 37 (1st Dep't 2010). For example, in *Alter v. Bogoricin*, plaintiff brought an action against multiple defendants for, *inter alia*, breach of his employment contract and breach of the implied covenant arising out of his termination. No. 97 CIV. 0662 (MBM), 1997 WL 691332, at *1 (S.D.N.Y. Nov. 6, 1997). Plaintiff alleged that the defendants breached their contract because defendants "withheld incentive, profit sharing, and salary payments; withheld vacation benefits; failed to give him six months notice prior to termination; and terminated him without cause." *Id*. at *4. Plaintiff further alleged that defendants breached the implied covenant by failing "to provide him with financial records that would have allowed him to calculate his incentive compensation and profit sharing payments, and [by] barr[ing] him from entering his office after his termination." *Id*. at *7. Although "plaintiff did not allege withholding or concealment of financial information in the breach of contract portion of his complaint," the court found that the implied covenant claim was, in part, duplicative of the contract claim because "the damages plaintiff [sought] as a result of defendants' alleged failure to turn over financial information [was] identical to the damages he [sought] for the alleged breach of contract—in both instances, unpaid compensation." *Id*. at *8. Accordingly, for this and other reasons not relevant here, the court dismissed plaintiff's breach of the implied covenant claim. *Id*.

24

Here, Clayton's breach of the implied covenant claim is duplicative of its contract claim. Although Clayton's contract claim is based on Sun West's non-payment of the invoices while Clayton's implied covenant claim is based on Sun West's allegedly wrongful conduct in terminating the contract and withholding payment of the invoices, like the plaintiff in *Alter*, it is clear that Clayton seeks identical damages for both claims—i.e., the monies due under the invoices plus interest. Accordingly, Clayton's implied covenant claim fails as duplicative.[14] *See also Marcum & Kliegman LLP*, 893 N.Y.S.2d at 37 (affirming dismissal of implied covenant claim where plaintiff failed "to allege actual ascertainable damages arising in connection with such claims, which were nonduplicative of the damages asserted in connection with its breach of contract claims"); *Mill Fin., LLC v. Gillett*, 992 N.Y.S.2d 20, 25 (1st Dep't 2014) (finding that the implied covenant claim was duplicative of the contract claim where the same damages flowed from each claim even though "[t]he conduct alleged in the two causes of action [was not] identical in every respect"); *Fuller Landau Advisory Servs. Inc.*, 333 F. Supp. 3d at 315 (finding dismissal of breach of the implied covenant claim required where both conduct and damages alleged therein were identical to the conduct and damages asserted with respect to the breach of contract claim).

**Sun West's Affirmative Defenses**[15]

**1.     Fraudulent Inducement**

Under New York law, fraudulent inducement is established through the basic elements of fraud: (1) "a representation of material fact"; (2) "the falsity of that representation"; (3) "knowledge by the party who made the representation that it was false when made";

---

[14] Neither party addressed this specific issue in the post-trial briefs, that is, whether Clayton's implied covenant claim is duplicative of its contract claim insofar as it seeks identical damages for both claims. If Clayton believes the Court has overlooked controlling case law that would alter this outcome, it may file a motion for reconsideration.

[15] The Court deems abandoned Sun West's affirmative defenses set forth in its Amended Answer that were not briefed. To the extent not already addressed, the Court will consider Sun West's affirmative defenses regarding damages in subsequent proceedings as discussed in the "Damages" section.

(4) "justifiable reliance"; and (5) "resulting injury." *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011). The party making the false representation must also intend to induce the other party's reliance. *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009). The foregoing elements must be proved by clear and convincing evidence. *See Simcuski v. Saeli*, 44 N.Y.2d 442, 452 (1978); *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007). Clear and convincing evidence consists of "proof that makes it highly probable that the alleged activity actually occurred[.]" *Ferreyra v. Arroyo*, 35 N.Y.3d 127, 128 (2020) (internal quotation marks omitted). Further, "[i]t is well established that if the facts represented are not matters peculiarly within the [misrepresenting party's] knowledge, and the [other party] has the means available to [it] of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, [the other party] must make use of those means, or [it] will not be heard to complain that [it] was induced to enter into the transaction by misrepresentations[.]" *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 25 N.Y.3d 1043, 1044 (2015) (internal quotation marks and citations omitted).

The Court is not persuaded by Sun West's argument. The theory appears to be that Clayton misrepresented that it could and would perform all PCQC services to agency guidelines notwithstanding the fact that such a requirement was not negotiated as part of the contract. Sun West relies largely on Mr. Fernandez's after-the-fact characterization of Sun West's expectations and Clayton's failure to meet them. His testimony does not establish clear and convincing evidence on this issue.

### 2. Unclean Hands

Under New York law, "[u]nclean hands is an equitable defense to equitable claims." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 607 (2d Cir. 2005). Thus, the unclean hands

defense is unavailable in an action at law for damages. *See id.*; *see also Manshion Joho Ctr. Co. v. Manshion Joho Ctr., Inc.*, 806 N.Y.S.2d 480, 482 (1st Dep't 2005) ("The doctrine of unclean hands is an equitable defense that is unavailable in an action exclusively for damages[.]"); *Greco v. Christoffersen*, 896 N.Y.S.2d 363, 366 (2d Dep't 2010) (same).

Notwithstanding, Sun West asserts that the unclean hands defense is available despite the legal nature of Clayton's claims. Sun West relies, in part, on *Ins. Co. of N. Am. v. Milberg Weiss Bershad Specthrie & Lerach* wherein a federal district court found that the equitable defense of unclean hands, among others, may be asserted regardless of the legal nature of the claims. No. 95 CIV. 3722 (LLS), 1996 WL 520902, at *8 (S.D.N.Y. Sept. 12, 1996). However, as pointed out in *RST (2005) Inc. v. Research in Motion Ltd.*, the *Milberg* court "relied on a case in which the [Second Circuit] considered and rejected on the merits an unclean hands defense in a legal action, without considering whether the defense was available in a legal action." No. 07 CV 3737 (VM), 2008 WL 5416379, at *8 (S.D.N.Y. Dec. 17, 2008) (citing *Mallis v. Bankers Tr. Co.*, 615 F.2d 68, 75–77 (2d Cir. 1980)).[16] In view of the authority cited above, the affirmative defense of unclean hands has no application to this case.

### 3.    Estoppel

Estoppel "is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought[.]" *Fundamental Portfolio Advisors,*

---

[16] Sun West also cites to *Readco, Inc. v. Marine Midland Bank* for the proposition that the Second Circuit has recognized that equitable defenses may be asserted regardless of the legal nature of the claims. 81 F.3d 295 (2d Cir. 1996). Sun West misreads *Readco*. In *Readco*, the court did not address in any fashion equitable defenses asserted by the defendants. *Id.*

*Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 106 (2006) (internal quotation marks and citation omitted). "Thus, equitable estoppel is a principle or an affirmative defense that serves to stop another party from denying a material fact." *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir. 1996). "Under New York law, '[t]he elements of estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. The party asserting estoppel must show with respect to himself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position.'" *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 607 (2d Cir. 2005) (citing *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 430 N.Y.S.2d 179, 187 (4th Dep't 1980)). The party asserting equitable estoppel must establish the elements by clear and convincing evidence. *See Dombroski v. Samaritan Hosp.*, 846 N.Y.S.2d 430, 433 (3d Dep't 2007); *see also Claudia B. v. Darrin M.*, 128 N.Y.S.3d 10, 11–12 (1st Dep't 2020) ("To prevail on estoppel grounds, the moving party bears the burden of proving, by clear and convincing evidence, a right to the relief sought[.]"). Moreover, "equitable estoppel is to be invoked sparingly and only under exceptional circumstances[.]" *Badgett v. N.Y.C. Health & Hosps. Corp.*, 641 N.Y.S.2d 299, 300 (1st Dep't 1996). For the reasons discussed above regarding the affirmative defense of fraudulent inducement, the Court finds that Sun West has failed to meet its burden of proof with respect to this defense.

### 4.   Excuse, Plaintiff's Breach, Failure to Meet Condition Precedent

Sun West asserts that it is excused from performance under the contract because Clayton breached the contract by failing to perform all PCQC services to agency guidelines. It further asserts that performing PCQC services to agency guidelines was a condition precedent to Sun

West's obligation to pay Clayton. "[A] 'party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract[.]'" *Robert Cohn Assocs., Inc. v. Kosich*, 881 N.Y.S.2d 235, 237 (3d Dep't 2009) (citing *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)). Accordingly, "[i]f the party in default has substantially performed, the other party's performance is not excused." *Hadden v. Consol. Edison Co. of New York*, 34 N.Y.2d 88, 96 (1974). Similarly, "a condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises[.]" *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (internal quotation marks and citation omitted).

As discussed above, Clayton did not materially breach the contract because Clayton was not required to perform reverifications to agency guidelines, and it otherwise satisfied its obligations. As such, Sun West was not excused from performance under the contract and nor did Clayton fail to perform a condition precedent to Sun West's performance under the contract.

### 5. No Meeting of the Minds

"To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound. That meeting of the minds must include agreement on all essential terms[.]" *Kolchins v. Evolution Markets, Inc.*, 8 N.Y.S.3d 1, 9 (1st Dep't 2015), *aff'd*, 31 N.Y.3d 100 (2018) (internal quotation marks and citations omitted). "It is well established that a contract is unenforceable where there is no meeting of the minds between the parties thereto regarding a material element thereof[.]" *Brands v. Urban*, 587 N.Y.S.2d 698, 700 (2d Dep't 1992). "Where an agreement has been reduced to a writing, the Court, in assessing whether a contract fails for lack of meeting of the minds, must look to the terms of the

written agreement to determine whether mutual assent has occurred." *Int'l Paper Co. v. Suwyn*, 966 F. Supp. 246, 254 (S.D.N.Y. 1997). "Where the offeror, using ambiguous language, reasonably means one thing and the offeree reasonably understands differently, there is no contract[.]" *Urban*, 587 N.Y.S.2d at 700 (internal quotation marks and citation omitted).

Sun West's argument is, in essence, if Clayton's allegations are proven, then there was no meeting of the minds because Sun West contests those allegations. This was a written contract between sophisticated parties, each represented by counsel. This, heads I win, tails you lose argument is unpersuasive.[17] As discussed above, the contract contains no ambiguity from which a failure of the meeting of the minds might be inferred.

**Damages**

Having determined that Clayton has met its burden of proof on Counts One and Two and that Sun West has not met its burden of proof with respect to its affirmative defenses, the Court turns to the question of damages. Clayton seeks the following damages:

A. Unpaid invoices in the following amounts: January - $90,575.50; February - $143,309.40; March - $213,662.65; April - $195,008.80; May - $175,923.70.

B. Contractual interest

Clayton is entitled to recover the amount of the unpaid invoices and it appears that the contract, under some circumstances, allows for a calculation of interest as well. However, during the trial, the parties agreed that if the Court determined the question of liability in Clayton's favor, additional argument or submissions would be required on the question of an award of interest.[18]

---

[17] Alternatively, and with minimal analysis, Sun West asserts that Clayton, through its own conduct, ratified or accepted Sun West's position that the PCQC services were to be done to agency guidelines. The Court disagrees. Clayton did not abandon its right to payment under the contract when, to appease a valuable client, it expanded the scope of its work beyond what was required in the contract.

[18] The Court does not herein decide whether Clayton is entitled to interest under the contract.

Accordingly, the Court will schedule a telephonic scheduling conference to identify the path forward.

**Conclusion**

The Court does not look to the negotiations to determine the terms of a contract unless the contract negotiated is ambiguous with respect to the parties' intentions. With respect to the reverification services, the contract contemplated and required limited and contingent work by Clayton and, as discussed above, did not require reverification to agency guidelines. All of Sun West's defenses flow from its claim to the contrary. But the better, more credible and weightier evidence is that Sun West decided during the PCQC engagement that it wanted a different contract than the one it had negotiated.

Judgment shall enter in favor of Clayton in an amount to be determined after additional submissions by the parties.

**SO ORDERED** at Bridgeport, Connecticut, this 10th day of June 2021.

      */s/ Kari A. Dooley*

KARI A. DOOLEY

UNITED STATES DISTRICT JUDGE