# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLAYTON SERVICES LLC, | ) | 3:17-CV-00172 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SUN WEST MORTGAGE COMPANY, | ) | |
| INC., | ) | |
| *Defendant*. | ) | FEBRUARY 11, 2022 |

## SUPPLEMENTAL MEMORANDUM OF DECISION RE: PLAINTIFF'S REQUEST FOR AN AWARD OF INTEREST

Kari A. Dooley, United States District Judge

This matter arises out of a contract between the parties, by which the Plaintiff, Clayton Services LLC ("Clayton"), was to perform Post-Close Quality Control ("PCQC") services for the Defendant, Sun West Mortgage Company, Inc. ("Sun West"), a residential and commercial mortgage lender. A trial before the Court was held to determine whether and to what extent the parties fulfilled their respective contractual obligations and to assess the financial responsibility that would flow from that determination. On June 10, 2021, the Court issued a Memorandum of Decision concluding that Clayton performed its contractual obligations such that Sun West's failure to pay Clayton for PCQC services rendered from January through May of 2016 was a breach of the parties' contract. With respect to damages, the Court concluded that Clayton is entitled to recover the amount of the unpaid invoices. The Court, however, required additional arguments and submissions on Clayton's request for an award of interest. Whether and the extent to which Clayton is entitled to an award of interest and the final award of damages for which Sun West is liable is determined herein. The parties' familiarity with the Court's prior ruling is presumed.

Clayton seeks (1) contractual prejudgment interest pursuant to § 3(b) of the MSA; (2) alternatively, statutory prejudgment interest pursuant to New York Civil Practice Law and Rules

("N.Y. C.P.L.R.") §§ 5001, 5004; and (3) offer of compromise interest pursuant to Conn. Gen. Stat. § 52-192a(a). In response, Sun West asserts that Clayton is not entitled to an award of interest, or alternatively, is entitled to only a significantly lesser amount than what it seeks. Oral argument was held on October 27, 2021. For the reasons that follow, the Court awards New York statutory prejudgment interest and Connecticut offer of compromise interest but does not award contractual prejudgment interest.

**Factual Findings and Procedural History**

"The decisions as to whose testimony to credit and which of permissible inferences to draw are solely within the province of the trier of fact[.]" *Chacko v. DynAir Servs., Inc.*, 272 F. App'x 111, 112 (2d Cir. 2008) (summary order) (internal quotation marks omitted). The Court incorporates herein the factual findings set forth in its June 10, 2021 Memorandum of Decision. The Court sets forth below particular facts, as found in the Memorandum of Decision, and additional facts, as found by a fair preponderance of the evidence, as necessary to the determination of the remaining issues decided herein.

Clayton is in the business of offering, among other services, residential loan due diligence, including PCQC services,[1] and has performed PCQC services for a variety of clients in the financial services industry, to include government-sponsored entities such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Sun West is a mortgage company that originates loans for both residential and commercial real estate. After a loan closing, Sun West is in the business of selling its loans to, among others, Fannie Mae and Freddie Mac or other federal government agencies. Lending

---

[1] Generally, after a residential mortgage loan is closed and the funds are disbursed to the borrower, the lending institution undertakes a review of the process by which the loan was approved, to include such items as the credit underwriting, the accuracy of data collection and recording, compliance with regulatory requirements, property valuation, verification of the borrower's income and the like. This process is known as PCQC.

institutions, such as Sun West, are required to undertake PCQC reviews for loans backed by or intended to be sold to Fannie Mae, Freddie Mac or other federal agencies. For these lenders and loans, the federal agencies in turn establish minimum protocols ("agency guidelines") for PCQC review and reporting and regularly audit lenders to determine compliance with the agency guidelines.

In late 2015, Sun West engaged Clayton to conduct PCQC review of its loans. During the course of those negotiations, Sun West communicated to Clayton on a number of occasions that Clayton's services were to be performed in accordance with agency guidelines. For example, by way of an email dated October 11, 2015, Sun West notified Clayton that the PCQC services are "to be conducted as per the guidelines laid down by [Fannie Mae] seller guide under '[l]ender quality control process overview.'" In that email, Sun West included the agency guidelines as set forth in the Fannie Mae Selling Guide.

The parties finalized and executed a Master Services Agreement ("MSA") and a Statement of Work ("SOW") in January of 2016. Among other provisions, the MSA provides the manner and means by which Clayton would invoice Sun West; the manner and means of addressing disputed invoices; the mechanism for terminating the contract for breach or otherwise; and the mechanism for dispute resolution should such disputes arise under the MSA. The MSA also contains a choice-of-law provision stating that the agreement "shall be governed by and interpreted in accordance with the laws of the State of New York for contracts to be wholly performed in such state and without giving effect to the principles thereof regarding the conflict of laws."

The SOW provides the details of the engagement to include the scope of the PCQC services and the extent of Clayton's obligations. Pursuant to the SOW, Clayton would perform PCQC review of Sun West loan files and generate monthly reports reflecting the results of the PCQC

analysis ("File Review Services"). The File Review Services made up the majority of the work required by Clayton under the terms of the MSA and SOW. The SOW also contemplates the use of third-party vendors for "Re-verifications" of, among other things, the employment and income of the borrowers ("Re-verification Services"). Nowhere in the MSA or the SOW did the parties include a requirement that Clayton conduct Re-verification services in accordance with agency guidelines. And as this Court has already determined, the SOW was inconsistent with any such requirement.

The parties amended the SOW on February 18, 2016 to expand the scope of Re-verification Services and to establish costs for those services. Specifically, the SOW was amended to reflect that Clayton would conduct the Re-verification Services if online products or services from third-party vendors were unsuccessful in this regard. Although Sun West did not initially request any third-party Re-verification Services, on February 25, 2016, Sun West sought the Re-verification Services identified in the SOW, as amended. Also, on February 25, 2016, Sun West notified Clayton by email that, the PCQC services rendered in January of 2016 were not compliant with agency guidelines. Sun West informed Clayton that the PCQC services should be performed in accordance with the agency guidelines and set forth in its email instructions as to how Clayton should conduct PCQC services to comply with those guidelines. (P. Ex. 16; D. Ex. 545). For example, Sun West requested an increase in the sample size as well as specified the types of samples to be selected by Clayton.

As previously determined, from January through May of 2016, Clayton provided PCQC services for Sun West in accordance with the initial and amended terms of the SOW. Pursuant to § 3(b) of the MSA, Clayton submitted the following invoices to Sun West:

a. Invoice No. 0016620R, dated May 4, 2016, balance of $90,575.50 for PCQC services rendered in January of 2016, delivered July 19, 2016;

4

      b. Invoice No. 0017301, dated August 3, 2016, balance of $143,309.40 for PCQC services rendered in February of 2016, delivered August 4, 2016;

      c. Invoice No. 0017310, dated August 3, 2016, balance of $213,662.65 for PCQC services rendered in March of 2016, delivered August 4, 2016;

      d. Invoice No. 0017311, dated August 3, 2016, balance of $195,008.80 for PCQC services rendered in April of 2016, delivered August 4, 2016; and

      e. Invoice No. 0017325, dated August 3, 2016, balance of $175,923.70 for PCQC services rendered in May of 2016, delivered August 4, 2016.

(P. Ex. 43–47; ECF No. 131, 272:1–7). Sun West has made no payment on any of the invoices submitted by Clayton. The balance of the unpaid invoices for PCQC services rendered from January through May of 2016 totals $818,480.05.[2]

During the engagement, Sun West learned of deficiencies in the services provided by its former PCQC vendor, XL Dynamics. Specifically, on or about April 5, 2016, Sun West received a Mortgage Origination Risk Assessment report conducted by Fannie Mae ("MORA report"),[3] which concluded that XL Dynamics' PCQC review was not in compliance with agency guidelines and that Sun West was not conducting a review of its PCQC vendor's work as required. Fannie Mae required remediation of the issues identified in the MORA report and instructed Sun West to submit an action plan to Fannie Mae detailing its intended corrective action by April 15, 2016. Fannie Mae directed Sun West to provide it with: (1) a complete copy of Sun West's amended PCQC plan to include written policies and procedures designed to govern the management and monitoring of its PCQC vendor; and (2) complete copies of the most recent two months of audit assessment reports completed on the performance of its PCQC vendor. (D. Ex. 559). Essentially,

---

[2] In paragraph nine of the Complaint, Clayton alleges that "[o]f the total amount of $818,480.05 invoiced by Clayton, at least $782,744.05 related to the [File Review Services], and at most only $35,736.00—approximately 4.4%—related to the [Re-verification Services]."

[3] Sydney Fernandez, a systems analyst for Sun West, testified that Sun West had received preliminary findings pertaining to the MORA report as early as February of 2016. (ECF No. 132, Tr. 489:4-8). This date is more closely aligned with when Sun West began to raise concerns about Re-verification Services not being done to agency guidelines.

Sun West's remediation of the deficiencies identified by Fannie Mae was dependent on the adequacy and accuracy of the PCQC services performed by Clayton.

Upon receiving the unfavorable MORA report, Sun West again complained to Clayton that Clayton's Re-verification Services were not being performed to agency guidelines and identified a number of deficiencies in that regard. For its part, Clayton attempted to assuage Sun West's concerns and repeatedly assured Sun West that it could and would meet agency guidelines. For example, by way of a June 2, 2016 email, Clayton notified Sun West that it was "putting an all hands full focus on this to rectify the [PCQC] issues [Sun West] brought up," and that Clayton was "committed to ensure that [it was] fully meeting [Sun West's] expectations and [was] calibrated on deliverables going forward." (D. Ex. 585). This dialogue—Sun West being dissatisfied with Clayton's Re-verification Services and Clayton offering corrective action and assurances— continued through May and into June of 2016.[4] During that time, Sun West continued to express dissatisfaction with Clayton's work.

Ultimately, Sun West sent Clayton a letter dated July 6, 2016 ("Termination Letter") stating that, effective July 16, 2016, it was terminating the SOW pursuant to § 2(c) of the MSA, which is titled "Termination for Breach," and § 7 of the SOW, which is titled "Term," and stating that Clayton had failed to provide the services as contemplated by the SOW and Sun West's standards and expectations.

In an internal memorandum dated August 17, 2016, Sun West memorialized a conference call that took place on July 27, 2016 between representatives of each party as follows:

> John Guy opened the call talking about how Clayton has revised its processes, etc., based on [Sun West's] feedback. Sydney [Fernandez] had to interject and confirm

---

[4] Clayton did not, at that time, assert that the SOW did not require agency guideline compliance with respect to Re-verification Services as it considered Sun West a valuable client. And as the Court has previously determined, during this time, the engagement morphed into something very different than was required under the MSA and the SOW.

that [Clayton] had indeed received the Termination Notice from Sun West [with respect to] the [PCQC] SOW. Sydney further let [Clayton] know that the work [it] performed for Sun West was not as per Agency Guidelines; and has resulted in it being written up by Fannie Mae as part of their Lender Review process. As such, since Clayton did not produce work as per the agreement; Sun West would not pay [Clayton] for the same. (P. Ex. 24).

By letter dated September 15, 2016, Clayton requested Sun West to propose mediators to conduct a mediation prior to the initiation of any litigation over the payment of Clayton's invoices, as required by § 17(d)(i) of the MSA. Clayton formally initiated mediation with the American Arbitration Association on September 28, 2016. Mediation occurred on December 22, 2016. The mediation was unsuccessful.

By Complaint dated February 6, 2017, Clayton asserts that it performed its obligations under the MSA and SOW but that Sun West refused to make payment in breach of contract.[5] Clayton seeks damages for the outstanding balance of the invoices rendered for PCQC services from January through May of 2016. On September 1, 2017, Clayton submitted an offer of compromise to Sun West pursuant to Conn. Gen. Stat. Sec. 52-192a(a) to settle the claim underlying this action for $725,000. Sun West did not accept Clayton's offer of compromise.

During the trial to the Court, Sun West relied, in large measure, on Clayton's alleged failure to adequately perform Re-verification Services to justify non-payment of Clayton's invoices. Specifically, Sun West averred that Re-verification Services contemplated under the SOW were required to be performed pursuant to agency guidelines. Sun West contended that Clayton's failure to conduct Re-verification Services in accordance with agency guidelines rendered all of Clayton's work valueless to Sun West, thereby justifying both the termination of the contract and the

---

[5] Clayton also claimed that Sun West breached the implied covenant of good faith and fair dealing by (1) purporting to terminate the contract without abiding by the terms of the termination clause of the MSA and SOW; (2) withholding payment on all invoices while only disputing a small portion of the invoices; and (3) refusing to communicate with Clayton regarding the nonpayment of invoices. The Court dismissed this claim because the damages sought were duplicative of the damages sought for the breach of contract claim.

withholding of payment. In response, Clayton asserted that the SOW as amended is unambiguous and contains no obligation to conduct PCQC services according to agency guidelines.

In its Memorandum of Decision, the Court concluded that "Sun West breached the contract when it failed to pay Clayton for [File Review] services, irrespective of the dispute regarding Clayton's performance of the reverification obligations of the contract." The Court elaborated that "the decision to withhold all payment even though the reverification services represented but a small part of the work under the contract is without reasonable explanation." With respect to Re-verification Services, the Court determined that "Clayton has met its burden that it performed its obligations . . ., such that Sun West's failure to pay Clayton's invoices for these services was also a breach of the contract." The Court ultimately concluded that "Clayton is entitled to recover the amount of the unpaid invoices."

**Discussion**

Clayton asserts three distinct grounds for an award of interest. First, Clayton claims contractual prejudgment interest pursuant to § 3(b) of the MSA on the sum of the unpaid invoices. Alternatively, Clayton claims statutory prejudgment interest pursuant to N.Y. C.P.L.R §§ 5001, 5004 on the portion of any unpaid invoice on which contractual prejudgment interest is not awarded. Finally, Clayton claims offer of compromise interest pursuant to Conn. Gen. Stat. § 52-192a(a) on the total amount of the judgment, including any prejudgment interest. The Court will address each request in turn.

### Contractual Interest

Clayton seeks contractual prejudgment interest pursuant to § 3(b) of the parties' MSA on the sum of the unpaid invoices.

Section 3 of the MSA provides in relevant part:

(b) <u>Invoicing and Payment</u>. . . . The Company agrees to pay all undisputed invoices, or the undisputed portions thereof, within thirty (30) days of receipt. Except in the case of disputed invoices, if payments are not received within sixty (60) days after the Company's receipt of such invoice, each Supplier reserves the right to impose, and the Company agrees to pay, interest on overdue balances for each day of the period starting with the forty-sixth (46th) day following receipt of the invoice and ending on the day payment is received by the Supplier, provided that the Supplier has provided the Company with notice that the relevant invoice is overdue. Interest will be computed on a rate of twelve percent (12%) per annum, compounded daily, not to exceed 18% per year. . . .

(d) <u>Disputed Invoices</u>. If the Company, in good faith, disputes any invoice (or a portion thereof), it may withhold payment of any disputed amounts but agrees to pay any non-disputed portions in accordance with Section 3(a) *[sic]*. Prior to the initiation of any dispute resolution as provided in this Agreement, Company and the Supplier agree to work together in good faith to resolve any disputes concerning any invoice.

Section 3(b) of the MSA establishes three prerequisites to an award of prejudgment interest on unpaid invoices: (1) the invoice must have been unpaid for 60 days after Sun West's receipt, (2) Clayton must have provided Sun West with notice that the invoice is overdue, and (3) the invoice must not have been subject to a good faith dispute.

The dispute at this juncture largely centers on the third prerequisite—whether the invoices were subject to a good faith dispute. "In general, an act done 'in good faith' is one performed 'with honesty or sincerity of intention.'" *Ziparo v. CSX Transportation, Inc.*, 15 F.4th 153, 158 (2d Cir. 2021) (citing *In Good Faith*, Oxford English Dictionary (3d ed. 2014); *Good Faith*, Black's Law Dictionary (11th ed. 2019)). "That standard is on its face a subjective one, embracing only the actor's state of mind; it is unconcerned with whether the actor's belief or purpose meets an objective standard of reasonableness." *Id*. at 158–59. "Accordingly, one may hold a belief or undertake an act in good faith, even if that belief or act is objectively unreasonable." *Id.* at 159.

Clayton argues that the Court's findings as set forth in the Memorandum of Decision preclude a determination that Sun West disputed any of Clayton's PCQC invoices in good faith.

Clayton relies largely on the Court's finding that Sun West's "decision to withhold all payment even though the reverification services represented but a small part of the work under the contract is without reasonable explanation." Sun West, on the other hand, argues that Clayton is not entitled to an award of contractual interest because Sun West disputed in good faith the entire portions of the unpaid invoices. Specifically, Sun West asserts that it believed in good faith that PCQC services contemplated under the SOW were required to be performed pursuant to agency guidelines, and that Clayton's failure to conduct Re-verification Services in accordance with such guidelines rendered all of Clayton's PCQC services valueless to Sun West.

As detailed above, at trial, Sun West offered parol, and other extrinsic, evidence to established that it was the intent of the parties that Clayton would conduct Re-verification Services in accordance with agency guidelines. Because the Court found the MSA and SOW unambiguous as to this issue, the Court's determinations with respect to parties' obligations under the MSA and SOW did not permit consideration of such parol, or other extrinsic, evidence. *See Ng v. Schram*, 604 F. App'x 75, 76 (2d Cir. 2015) ("The parol evidence rule . . . prohibits the admission of evidence . . . whose effect is to add to, vary, modify, or contradict the terms of a writing."). At this juncture, however, the Court finds the parties' discussions prior to and contemporaneous with the execution of the MSA and SOW, and interactions thereafter, as probative on the issue of whether Sun West disputed Clayton's invoices in good faith and therefore proper for the Court's consideration. *See Bona v. Barasch*, No. 01 CIV. 2289 (MBM), 2003 WL 21222531, at *6 (S.D.N.Y. May 27, 2003) (finding that "evidence of intent may be considered, notwithstanding the parol evidence rule" where "evidence of the parties' intent does not contradict or vary the terms of the contract"). Here, neither the MSA nor the SOW define the parameters of a good faith dispute. Evidence pertaining to the nature and extent of Sun West's dispute over Clayton's invoices and

the parties' efforts to address that dispute therefore does not contradict the terms of the MSA or the SOW on this issue. *See Bloor v. Shapiro*, 32 B.R. 993, 998 (S.D.N.Y. 1983) (noting that "it is . . . well settled that extrinsic evidence is admissible . . . to establish terms not inconsistent with the express terms of the writing."); *see also Krofft Ent., Inc. v. CBS Songs, a Div. of CBS, Inc.*, 653 F. Supp. 1530, 1532 (S.D.N.Y. 1987) (stating that "where the parol evidence sought to be introduced does not contradict an express term in contract, the rule does not apply.").

In light of this extrinsic evidence, the Court is persuaded that Sun West sincerely believed that Clayton's PCQC services were inadequate under the terms of the contract, and thus disputed Clayton's invoices in good faith. First, as detailed above, the parties' negotiations reveal that, at least at some point, Sun West contemplated compliance with agency guidelines as an important component of its agreement with Clayton. Specifically, in October of 2015, Sun West notified Clayton of its expectation that Clayton conduct the PCQC services in accordance with agency guidelines and, prior to entering an agreement, Sun West provided relevant guidelines for Clayton's consideration. Moreover, the parties' post-agreement communications reveal that Clayton agreed to address identified deficiencies and did not during their engagement object to Sun West's requests as outside the scope of the contract. Accordingly, the Court finds that the parties' communications and Clayton's acquiescence to Sun West's demands provided Sun West with sincere reason to believe that, absent compliance with agency guidelines, Clayton's Re-verification Services were inadequate under the terms of the SOW and Sun West's expectations. The Court's prior determination that the contract unambiguously did not provide for compliance with agency guidelines does not preclude a finding of a good faith dispute.[6]

---

[6] In its Memorandum of Decision, the Court stated inarticulately in dictum that after the engagement began, Sun West decided "it wanted a different contract than the one it had negotiated." This statement was not a conclusion as to Sun West's motives or understanding regarding the terms of the contract, but rather an observation that its demands were not aligned with the requirements of the MSA or SOW as determined by the Court.

Further, the evidence also supports the conclusion that Sun West disputed the entirety of Clayton's invoices based upon its good faith belief that the deficiencies in the Re-verification Services rendered all of Clayton's work valueless. During their engagement, Sun West came to rely on Clayton specifically to provide agency-compliant PCQC review for purposes of remediating the deficiencies identified in Fannie Mae's MORA report. Indeed, Sun West's expert witness, Kim Day, testified that if a portion of a PCQC report was defective, then the entire report would be considered defective and out of compliance with agency guidelines. (ECF No. 161, Tr. 904:12-25, 905:1-10). While the Court did not reach this issue because it determined that the Re-verification Services were in accordance with the terms of the SOW, an expert opinion supporting Sun West's position counsels a finding that the position was sincerely held. Although it may have been objectively unreasonable under the terms of the SOW for Sun West to require Clayton's compliance with agency guidelines for Re-verification Services or to withhold all payment even though Re-verification Services represented but a small part of the PCQC services, the Court does not concern itself with whether Sun West's belief or purpose meets an objective standard of reasonableness. *Ziparo*, 15 F.4th at 158–59. Accordingly, because the Court concludes that Sun West disputed the invoices in good faith, the third prerequisite to an award of contractual prejudgment interest is not met, and Clayton's request for same is denied.[7]

**New York Statutory Interest**

**1.      Applicability of New York Statutory Interest**

Clayton seeks statutory prejudgment interest pursuant to N.Y. C.P.L.R. §§ 5001, 5004 on the portion of any invoice on which contractual prejudgment interest is not awarded. In its submissions to the Court, Sun West advances no substantive arguments in opposition to the

---

[7] The Court need not address the parties' arguments with respect to the first and second prerequisites.

imposition of New York statutory prejudgment interest.[8] At oral argument, however, Sun West asserted that the language of the MSA affirmatively forecloses the imposition of statutory prejudgment interest where unpaid invoices are disputed in good faith. Specifically, Sun West argues that, because the MSA only explicitly provides for prejudgment interest on unpaid invoices that are not subject to a good faith dispute, no prejudgment interest can be imposed on an unpaid invoice disputed in good faith. In response, Clayton argues that the MSA is silent as to whether prejudgment interest can be imposed on unpaid invoices disputed in good faith and, accordingly, the imposition of New York statutory interest is applicable at the default interest rate provided in the statute in the event of a breach. The Court agrees with Clayton. *See NML Cap. v. Republic of Argentina*, 17 N.Y.3d 250, 258, 952 N.E.2d 482 (2011) ("If the parties failed to include a provision in the contract addressing the interest rate that governs . . . in the event of a breach, New York's statutory rate will be applied as the default rate.").

As discussed above, the MSA contains a choice-of-law provision stating that the agreement "shall be governed by and interpreted in accordance with the laws of the State of New York for contracts to be wholly performed in such state and without giving effect to the principles thereof regarding the conflict of laws." Tr. Ex. 1 at 14. The parties do not dispute that, pursuant to the choice-of-law provision of the MSA, New York law applies to the substantive issues of liability and damages. *See* Restatement (Second), Conflicts of Laws §§ 187, 207, comment e.[9] Under N.Y.

---

[8] Sun West primarily contends that an award of statutory prejudgment interest pursuant to New York law is inconsistent with Clayton's request for an award of offer of compromise interest pursuant to Connecticut law. These arguments are addressed by the Court in its discussion with respect to Clayton's request for an award of offer of compromise interest pursuant to Conn. Gen. Stat. § 52-192a(a).

[9] The Restatement (Second) of Conflicts of Laws § 187 provides in pertinent part: "(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."

Section 207 provides that "[t]he measure of recovery for a breach of contract is determined by the local law of the state selected by application of the rules of §§ 187–88."

Comment e of § 207 provides that "[t]he local law of the state selected by application of the rule of this Section determines whether plaintiff can recover interest, and, if so, the rate, upon damages awarded him for the period

C.P.L.R. § 5001, "a plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right." *U.S. Naval Inst. v. Charter Communications, Inc.*, 936 F.2d 692, 698 (2d Cir. 1991); *see* N.Y. C.P.L.R. § 5001(a) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract."). Having determined that New York law applies to Clayton's contract-based claims, that Clayton is entitled to recover damages for breach of contract, and that the MSA is silent as to the imposition of interest on unpaid invoices disputed in good faith, the Court thus concludes that Clayton is entitled to an award of statutory prejudgment interest pursuant to N.Y. C.P.L.R. § 5001.

### 2.     Calculation of New York Statutory Interest

New York statutory prejudgment interest "accrues at a statutory rate of 9% per annum and is computed from the earliest ascertainable date the cause of action existed." *Foley v. Wilson*, No. 18-CV-504 (RA), 2020 WL 30338, at *5 (S.D.N.Y. Jan. 2, 2020) (internal quotation mark omitted); *see* N.Y. C.P.L.R. § 5001(b) ("Interest shall be computed from the earliest ascertainable date the cause of action existed. . . ."); *see also* N.Y. C.P.L.R. §§ 5004 ("Interest shall be at the rate of nine per centum per annum . . . ."). "The party seeking prejudgment interest bears the burden of demonstrating the date from which interest should be computed." *Kachkovskiy v. Khlebopros*, 164 A.D.3d 568, 572 (2018); *see also CA, Inc. v. Network Sols. Provider, Inc.*, No. 17-CV-3623, 2018 WL 6834472, at *2 (E.D.N.Y. Dec. 28, 2018) ("The burden is on the plaintiff to demonstrate its entitlement to pre-judgment interest."). "[W]hen the record does not reveal the date on which a plaintiff's cause of action arose, prejudgment interest may be awarded from the date a plaintiff commenced the action." *Nwagboli v. Teamwork Transp. Corp.*, No. 08-CV-4562

---

between the breach of contract and the rendition of judgment. This law also determines the validity of an express contractual provision for the payment of a stipulated rate of interest."

(JGK) (KNF), 2009 WL 4797777, at *12 (S.D.N.Y. Dec. 7, 2009) (citing *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 512 (2d Cir. 1994)).

In its submissions to the Court, Clayton does not identify the earliest ascertainable date the cause of action existed for purposes of computing statutory prejudgment interest pursuant to N.Y. C.P.L.R. § 5001(b). During oral argument, however, Clayton contends that the earliest ascertainable date that the cause of action existed is July 27, 2016, when Sun West notified Clayton during a conference call that it would not pay any invoices for PCQC services rendered. Sun West, on the other hand, argues that the earliest ascertainable date the cause of action existed is February 6, 2017—the 46th day after the parties' December 22, 2016 mediation, when Sun West alleges Clayton provided notice that the invoices were overdue. Sun West identifies this date pursuant to § 3(b) of the MSA governing the imposition of contractual prejudgment interest for invoices that are not the subject of a good faith dispute. The Court disagrees with both parties.

Certainly, by July of 2016, the parties' contract dispute was readily apparent. However, the dispute was not at that time actionable because § 17(d)(i) of the MSA required that the parties participate in mediation in an effort to resolve disputed invoices prior to bringing any action in court. Further, insofar as the first invoice was not delivered until July 19, 2016 and the remaining invoices had not even been delivered by July of 2016, Sun West's obligation to render payment for the invoices pursuant to § 3(b) of the MSA had not yet accrued.[10] *See 155 Henry Owners Corp. v. Lovlyn Realty Co.*, 231 A.D.2d 559, 560, 647 N.Y.S.2d 30 (1996) ("the ascertainable date assumes that whatever damages are sought are shown to have been sustained at least by that time") (internal quotation mark omitted). Moreover, insofar as § 3(d) of the MSA permitted Sun West to withhold payment of invoices subject to a good faith dispute, Clayton has not demonstrated that it

---

[10] Section 3(b) of the MSA provides that Sun West "agrees to pay all undisputed invoices, or the undisputed portions thereof, within thirty (30) days of receipt."

was entitled to payment by July of 2016. *See 155 Henry Owners Corp.*, 231 A.D.2d at 560 ("[T]he award of interest is founded on the theory that there has been a deprivation of use of money. . . ."). And Sun West's argument, advanced without explanation, unfittingly equates the date on which contractual prejudgment interest would begin to accrue on overdue invoices that are not subject to a good faith dispute pursuant to § 3(b) of the MSA, which is not the situation here, with the earliest ascertainable date the cause of action existed for purposes of § 5001.[11]

In its June 10, 2021 Memorandum of Decision, the Court concluded that Sun West breached the contract when it failed to pay Clayton for the PCQC services rendered. However, the record before the Court, as supplemented by the parties' post-trial submissions and oral arguments, does not permit the Court, with any reasonable degree of certainty, to determine the earliest ascertainable date the cause of action existed in the event of a good faith dispute pursuant to § 3(d) of the MSA.[12] The Court therefore concludes that New York statutory prejudgment interest is to be calculated from the date Clayton commenced this action. *See Nwagboli*, 2009 WL 4797777, at *12 (calculating New York statutory prejudgment interest from date of commencement of action where "[n]either the complaint nor the subsequent submissions made to the Court indicate precisely when the defendants breached their contract with plaintiffs"); s*ee also*, *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 512 (2d Cir.1994) (finding it reasonable for court to use date of commencement of action to calculate New York statutory prejudgment interest where court is

---

[11] Section 3(b) of the MSA provides different dates by which payment for invoices not subject to a good faith dispute becomes due and interest on overdue invoices begins to accrue. *Compare* MSA § 3(b) (Sun West "agrees to pay all undisputed invoices, or the undisputed portions thereof, within thirty (30) days of receipt"), *with id.* (Sun West "agrees to pay . . . interest on overdue balances for each day of the period starting with the forty-sixth (46th) day following receipt").

[12] There is some appeal to Sun West's reliance on the failed mediation as a guidepost, but not because it served as Clayton's "notice" that the invoices were overdue per the requirements of § 3(d). Rather, once the mediation failed, Clayton's breach of contract claim became actionable under the terms of the MSA. However, neither party advances this date as the earliest ascertainable date the cause of action existed so the Court does not *sua sponte* pick this date.

unable to determine date that damages were incurred). Accordingly, statutory prejudgment interest is on the total outstanding balance of the invoices[13] to be calculated pursuant to N.Y. C.P.L.R. §§ 5001, 5004, at a rate of nine per cent per annum, from February 6, 2017,[14] the date Clayton commenced this action, until February 11, 2022, the date judgment entered, for a total award of statutory prejudgment interest of $369,325.10.

### Connecticut Offer of Compromise Interest

### 1.        Applicability of Offer of Compromise Interest

Clayton also seeks offer of compromise interest pursuant to Conn. Gen. Stat. § 52-192a(a).[15] Sun West contends that Clayton impermissibly claims an award of interest under both New York law and Connecticut law because an award under the laws of two different states would undermine *Erie R. Co. v. Tompkins*, 304 U.S. 64. "Under the doctrine of *Erie . . .*, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 416 (1996). Sun West specifically argues that if the Court determines that § 52-192a(a) is procedural for purposes of *Erie* analysis, then it cannot apply to this federal diversity action because federal procedural law applies. Sun West argues that if the Court

---

[13] Sun West argues that Clayton only claims New York statutory prejudgment interest on the portions of unpaid invoices pertaining to the Re-verification Services. Sun West misreads Clayton's position. In its post-trial submissions, Clayton specifically claimed that, to the extent it is not entitled to contractual prejudgment interest on any portion of the $818,480.05, it is nonetheless entitled to statutory prejudgment interest of 9% under New York law "on the portion(s) of any invoice(s) on which contractual interest is not awarded." Here, the Court does not award any contractual prejudgment interest and Clayton therefore seeks New York statutory prejudgment interest on the entire amount of the unpaid invoices.

[14] It is sheer coincidence that the date Clayton filed this lawsuit coincides with the date identified by Sun West as the appropriate start date under § 3(b) of the MSA.

[15] Conn. Gen. Stat. § 52-192a(a) provides, in relevant part: "[A]fter commencement of any civil action based upon contract or seeking the recovery of money damages . . ., the plaintiff may, not earlier than one hundred eighty days after service of process is made upon the defendant in such action but not later than thirty days before trial, file with the clerk of the court a written offer of compromise signed by the plaintiff or the plaintiff's attorney, directed to the defendant or the defendant's attorney, offering to settle the claim underlying the action for a sum certain. . . . The plaintiff shall give notice of the offer of compromise to the defendant's attorney or, if the defendant is not represented by an attorney, to the defendant himself or herself. . . . If the offer of compromise is not accepted within thirty days and prior to the rendering of a verdict by the jury or an award by the court, the offer of compromise shall be considered rejected and not subject to acceptance unless refiled. Any such offer of compromise . . . shall be included by the clerk in the record of the case."

determines alternatively that § 52-192a(a) is substantive for purposes of *Erie* analysis, then it also cannot apply because, under the MSA, New York law applies. Sun West relies primarily on *Frenette v. Vickery*, 522 F. Supp. 1098 (D. Conn. 1981) which held that the statute is "substantive" for purposes of the *Erie* doctrine.

Clayton responds that the *Erie* doctrine aside, § 52-192a is procedural for choice-of-law purposes, and therefore, applicable here. Clayton relies primarily on *Paine Webber Jackson & Curtis, Inc. v. Winters*, 22 Conn. App. 640, 579 A.2d 545, *cert. denied*, 216 Conn. 820, 581 A.2d 1055 (1990), which held that the statute is "procedural" for choice-of-law purposes, notwithstanding the *Frenette* court's *Erie* analysis. The Court agrees with Clayton.

In *Frenette*, the district court found that § 52-192a is substantive for purposes of *Erie* analysis, *i.e.*, deciding between state and federal rules, and therefore applied the statute to the personal injury case at issue. 522 F. Supp. at 1100–101. It is well established, however, that "[a] rule may be substantive for purposes of *Erie* analysis, but procedural under a state's choice of law analysis." *Mack Financial Servs. v. Poczatek*, No. CV 10-3799 JS AKT, 2011 WL 4628695, at *6 (E.D.N.Y. Aug. 30, 2011); *see Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 152 (2d Cir. 2013) (discussing that "a state's 'procedural' rules under its own choice-of-law principles can be 'substantive' for purposes of *federal* diversity jurisdiction"); *see, e.g.*, *Sun Oil Co. v. Wortman*, 486 U.S. 717, 726 (1988) (rejecting notion that "there is an equivalence between what is substantive under the *Erie* doctrine and what is substantive for purposes of conflict of laws"); *see also* 17A James Wm. Moore et al., *Moore's Federal Practice* § 124.30[4] (3d ed. 2005) ("The distinction between procedure and substance under state choice of law rules is not the same as under the *Erie* doctrine."). Indeed, the Court in *Frenette* recognized that "the Supreme Court has held that matters normally regarded as procedural are substantive for the purposes of the *Erie*

case." *Frenette*, 522 F. Supp. at 1101 (citing 2 Moore's Federal Practice P 1.04(4) at 227–28 (2d ed. 1980)).

Although § 52-192a confers substantive rights to litigants under *Erie* analysis, as found in *Frenette*, the Court must further determine whether the statute is procedural or substantive under a choice-of-law analysis. *See Wachovia Bank, N.A. v. Cummings*, No. 309CV957SRU, 2010 WL 466160, at *4 (D. Conn. Feb. 8, 2010) (applying Connecticut choice-of-law rules to determine whether Connecticut statute is substantive or procedural notwithstanding challenge that statute is deemed procedural for purposes of *Erie* analysis). "A federal court sitting in diversity applies the choice-of-law rules of the forum state." *Kinsey v. New York Times Co*., 991 F.3d 171, 176 (2d Cir. 2021). If § 52-192a is deemed procedural under Connecticut's choice-of-law rules, then the Court would give it application here. *See Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 778 n.10 (1984) ("Under traditional choice of law principles, the law of the forum [s]tate governs on matters of procedure."). Under Connecticut's choice-of-law principles, the question is simply whether a Connecticut trial court hearing this case would apply Connecticut's own offer of compromise statute where New York law governs the substantive issues of liability and damages. *See e.g. Liberty Synergistics,* 718 F. 3d at 152 ("In other words, once a federal court decides that a state rule of decision would apply in an identical action in state court, it is 'immaterial' whether that state rule of decision is labelled by state law as 'procedural,' 'substantive', both or neither.").

The Connecticut Appellate Court in *Paine Webber* has unequivocally answered this question in the affirmative. *Paine Webber* involved a contract dispute and the contracts at issue specified both that New York law would govern and that no interest would at any time be due. 22 Conn. App. at 650. The trial court denied plaintiff's request for an award of interest pursuant to § 52–192a on the ground that prejudgment interest on the debt was barred by both New York law

and the terms of the contracts. *Id*. at 649. On appeal, the plaintiff argued that § 52–192a is procedural under Connecticut's choice-of-law rules and should be applied notwithstanding the determination that another state's law governs substantive issues. *Id*. The Connecticut Appellate Court agreed. *Id*. Specifically, the Connecticut Appellate Court concluded that, although New York law applied to the substantive issues of liability and damages, and the parties' contract barred an award of interest on the debt, interest awarded pursuant to § 52–192a does not involve the determination of substantive contract and liability issues. *Id*. at 650. The court thus found § 52–192a to be applicable as a procedural law of the forum state. *Id*. at 656.

In so concluding that § 52–192a is procedural for choice-of-law purposes, the Connecticut Appellate Court explained how its decision was in no way inconsistent with *Frenette*:

> The *Frenette* court did not purport to determine whether the provisions of § 52–192a were "substantive" in an interstate choice of law setting. Rather, the court found Connecticut's offer of judgment statute to be "substantive" for the purposes of deciding between state and federal rules under the doctrine of *Erie* . . . . Thus, the court ruled that it must apply the forum state's "substantive" rule rather than the federal "procedural" offer of judgment rule, Fed. R. Civ. P. 68. . . . The *Frenette* court acknowledged that its determination that § 52–192a is a "substantive" rule was limited to this *Erie* context.

*Paine Webber*, 22 Conn. App. at 654–55. Under *Paine Webber*, it is clear that a Connecticut trial court hearing this case would apply § 52–192a as the procedural law of the forum state for purposes of choice-of-law analysis. Accordingly, Clayton is entitled to offer of compromise interest. *See Sberbank of Russia v. Traisman*, No. 3:14CV216 (WWE), 2016 WL 1430005, at *5 (D. Conn. Apr. 11, 2016), *aff'd in part*, *vacated in part on other grounds*, 686 F. App'x 75 (2d Cir. 2017) (applying § 52–192a to federal diversity action as procedural law of forum state under Connecticut's conflict-of-laws rules, in accordance with *Paine Webber*).[16]

---

[16] "[I]f state conflict-of-law principles call for a rule of decision (1) that would apply to the suit if it were brought in state court, (2) that is 'substantive' within the meaning if *Erie*, and (3) that is not displaced by a valid federal law or rule governing the same issue, then . . . the federal court sitting in diversity [is required] to apply the

### 2.      Calculation of Offer of Compromise Interest

Conn. Gen. Stat. Ann. § 52-192a(c) provides:

> "After trial the court shall examine the record to determine whether the plaintiff made an offer of compromise which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain specified in the plaintiff's offer of compromise, the court shall add to the amount so recovered eight per cent annual interest on said amount. . . . The interest shall be computed from the date the complaint in the civil action . . . was filed with the court if the offer of compromise was filed not later than eighteen months from the filing of such complaint."[17]

On September 1, 2017, Clayton filed an offer of compromise to settle the claim underlying this action for $725,000. Sun West did not accept Clayton's offer of compromise. In its June 10, 2021 Memorandum of Decision, the Court determined that Clayton is entitled to recover from Sun West, exclusive of prejudgment interest, the balance of the unpaid invoices for PCQC services rendered from January through May of 2016, totaling $818,480.05. Herein, the Court has determined that Clayton is further entitled to recover statutory prejudgment interest on the balance of the unpaid invoices, for a total, including the balance of the unpaid invoices and the award of statutory prejudgment interest,[18] of $1,187,805.15. Accordingly, offer of compromise interest is to be calculated at a rate of eight per cent per annum from February 6, 2017, the date Clayton filed its

---

state rule, irrespective of whether that rule is understood to be 'procedural' or 'substantive' as a matter of state law." *Liberty Synergistics*, 718 F.3d at 153. The Court notes that Sun West does not argue that the federal offer of judgment rule, Fed. R .Civ. P. 68, displaces § 52-192a as a valid federal law or rule governing the same issue. Nevertheless, in light of the Connecticut Appellate Court's decision in *Paine Webber*, it is firmly established that § 52-192a is understood to be procedural as a matter of state law.

   [17] Sun West also argues that the imposition of offer of compromise interest pursuant to § 52-192a is discretionary, which Clayton disputes. Clayton is correct. *See Paine Webber*, 22 Conn. App. at 653 ("The interest awarded [under § 52-192a] is in no way discretionary. The statute provides that the court *shall* examine the record after trial, and if the plaintiff's recovery exceeds the rejected offer of judgment found in the record, the court *shall* add interest to that recovery.").

   [18] The parties also disagree as to whether offer of compromise interest accrues only on the balance of unpaid invoices, as Sun West posits, or whether it accrues with respect to the award of prejudgment interest as well, as Clayton posits. The Court agrees with Clayton. *See Paine Webber*, 22 Conn. App. at 653 ("In an appropriate case, both [prejudgment and post-judgment interest] statutes could apply; the defendant could owe interest as damages on the debt and then owe interest on the total amount based on his refusal to settle.").

Complaint, until February 11, 2022, the date judgment entered, for a total award of offer of compromise interest of $476,423.76.

**Conclusion**

The Court awards Clayton the balance of the unpaid invoices for PCQC services rendered from January through May of 2016, totaling $818,480.05. The Court further awards statutory prejudgment interest pursuant to N.Y. C.P.L.R. §§ 5001, 5004 in the amount of $369,325.10. The Court further awards offer of compromise interest pursuant to Conn. Gen. Stat. § 52-192a(a) in the amount of $476,423.76.

The total amount of the judgment is $1,664,228.91. The Clerk of the Court is directed to enter judgment in favor of the Plaintiff and against the Defendant as provided herein and to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 11th day of February 2022.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE